125 T.C. No. 3

UNITED STATES TAX COURT

JOSEPH PAUL FREIJE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 932-02L.                    Filed July 14, 2005.


        P timely petitioned for review under sec. 6330(d),
I.R.C., of R's determination to proceed with levies to
collect unpaid Federal income taxes for 1997, 1998, and
1999.

        P claimed in his Appeals hearing and herein that
the proposed levy for 1997 should not be sustained
because a remittance he made in 1997 with respect to
his Federal income tax liability for that year was
instead applied improperly by R against a tax liability
alleged by R to exist for 1995.  Consequently, P
contends, R is attempting to collect a tax that has
been paid.  R contends that this Court lacks
jurisdiction to consider 1995, a year that was not the
subject of a notice of determination, to ascertain
whether a liability existed for that year, to which the
1997 remittance was applied.

        <u>Held</u>: P's claim concerning the disposition of his
1997 remittance is a relevant issue relating to the

unpaid tax for 1997, and we have jurisdiction to consider facts and issues arising in 1995, a year not the subject of the notice of determination, insofar as they are relevant to computing the unpaid tax for 1997.

Held, further, since P's Federal income tax return and payment for 1995 were untimely, resulting in the assessment of additions to tax for late filing and payment, R's application of P's 1997 remittance against the 1995 liability was proper.

In July 1998, P mailed a check to R for $1,776. R posted the check to P's 1997 account for the erroneous amount of $11,776. As $11,776 exceeded all unpaid assessments for 1997, R issued P a refund for 1997 of $5,513 in August 1998. After subsequently discovering his error, R applied four of P's 1999 remittances, totaling $6,500, to P's 1997 account. P claimed in his hearing request and herein that he had not received proper credit for all payments made with respect to 1999.

Held: R's application of P's 1999 remittances to P's 1997 account to recoup the erroneous nonrebate refund for 1997 contravenes O'Bryant v. United States, 49 F.3d 340 (7th Cir. 1995). These 1999 remittances should have been applied against unpaid taxes that are the subject of the instant levies. Consequently, the levies must be reconsidered by R on remand.

P claimed in his Appeals hearing and herein that the proposed levy for 1999 should not be sustained because R improperly changed the amounts shown as due on P's Federal income tax return for 1999. R concedes that he disallowed, pursuant to sec. 6213(b)(1), I.R.C., certain miscellaneous itemized deductions claimed on that return and made an assessment based thereon without issuing a notice of deficiency to P as required by sec. 6213(a), I.R.C. As a consequence, R contends, P is entitled in the instant proceeding to de novo review under sec. 6330(c)(2)(B), I.R.C., of his entitlement to these deductions, with any modifications resulting from the Court's review to be reflected in the amount of the assessment and levy.

Held: the 1999 levy, insofar as it is based on the disallowance of P's miscellaneous itemized deductions, may not proceed, as the assessment upon which it is

based is invalid; de novo review pursuant to sec. 6330(c)(2)(B), I.R.C., may not cure an assessment that is invalid for failure to comply with sec. 6213(a), I.R.C. Consequently, the 1999 levy must be reconsidered by R on remand.

Held, further, other issues raised by respondent's determination to proceed with the levies for 1997, 1998, and 1999 determined.

Joseph Paul Freije, pro se.

Diane L. Worland, for respondent.

GALE, Judge: Pursuant to section 6330(d),[1] petitioner seeks review of respondent's determination to proceed with collection by levy of income tax liabilities with respect to petitioner's 1997, 1998, and 1999 taxable years. The issue for decision is whether respondent may proceed with proposed levies for liabilities not conceded by him for 1998 and 1999.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The parties' stipulations and attached exhibits are incorporated herein by this reference.

Petitioner resided in Franklin, Indiana, when the petition in this case was filed.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended.

Petitioner and his spouse (Mrs. Freije; collectively, the Freijes) obtained an automatic 4-month extension (until August 15, 1996) to file their joint Federal income tax return for the 1995 taxable year (1995 return).[2] The 1995 return, untimely filed on November 18, 1996, reported tax due of $8,281.61 and was accompanied by a payment of $3,005.47 which, when added to the withholding credits listed of $5,276.14, satisfied the tax reported as due. Nonetheless, the untimely filing and payment triggered additions to tax for late filing and late payment, as well as interest, totaling $838.27, which was assessed on December 23, 1996.

On June 3, 1997, respondent received a $2,800 remittance from the Freijes. The record does not disclose whether this remittance was designated for any purpose. Respondent applied $869.46 of this remittance to the foregoing assessment for 1995 (plus an additional assessment of interest) and refunded the

---

[2] Our findings with respect to the Freijes' 1995 taxable year are based in part on Ex. 21-R, a certified copy of a Form 4340, Certificate of Assessments, Payments, and Other Specified Matters, covering the Freijes' individual income taxes for that year. At trial, we reserved ruling on the admissibility of the exhibit, because of uncertainty concerning whether respondent's counsel had identified and provided a copy of it to petitioner at least 14 days before trial, as required by the Court's standing pretrial order. We allowed petitioner to make a submission after trial with respect to the admissibility of Ex. 21-R. On the basis of petitioner's submission and the entire record in this case, we conclude that petitioner has failed to show prejudice from any failure to receive a copy of Ex. 21-R at least 14 days before trial. We accordingly hereby admit Ex. 21-R.

balance to the Freijes.  The Freijes also made remittances to respondent of $2,300 on June 10, 1997, and $1,500 on October 6, 1997, that respondent treated as payments of estimated tax for 1997.

The Freijes timely filed a joint Federal income tax return for the 1997 taxable year (1997 return) reporting a tax due of $21,510, listing withholding credits of $4,134, and claiming estimated tax payments of $6,600.[3]  A payment of $4,000 was sent with the 1997 return.  The $21,510 in tax reported as due on the 1997 return, as well as additions to tax for late payment and failure to pay estimated tax, plus interest, were assessed on June 8, 1998.  Subsequent remittances of $2,000 each were credited against the Freijes' 1997 liability on May 3 and June 1, 1998.  On or about July 6, 1998, petitioner mailed a check for $1,776 to respondent.[4]  This check was erroneously posted to the

_____

[3] The figure of $6,600 in claimed estimated tax payments for 1997 apparently reflected the Freijes' understanding that the three remittances they submitted to respondent during 1997 (i.e., $2,800, $2,300, and $1,500, for a total of $6,600) constituted estimated tax payments for that year.  However, as noted, respondent applied a portion of the initial $2,800 remittance to the Freijes' 1995 liability and refunded the balance.  Consequently, the total 1997 estimated tax payments recorded in the Freijes' account when their 1997 return was filed equaled $3,800 (i.e., the total of the latter two 1997 remittances), not the $6,600 reported on the 1997 return.

[4] If respondent had not applied a portion of the Freijes' 1997 remittance of $2,800 to their 1995 liability, the $1,776 remittance of July 6, 1998, would have resulted in total remittances for 1997 of $20,510, or $1,000 less than the tax

(continued...)

Freijes' 1997 account in the amount of $11,776 on July 8, 1998, which amount exceeded all assessments for 1997. As a consequence, respondent issued the Freijes a refund of $5,513 on August 3, 1998. At a time not disclosed in the record, respondent corrected the $10,000 error by reversing $10,000 of the $11,776 previously credited.[5] Subsequent remittances made by the Freijes in 1999 without designation for any year, totaling $6,500, were posted to their 1997 account as follows: $1,800 on May 26, 1999; $2,400 on June 16, 1999; $1,200 on July 9, 1999; and $1,100 on July 26, 1999.

The Freijes timely filed a joint Federal income tax return for the 1998 taxable year (1998 return) reporting a tax due of $11,686 and no withholding credits or estimated tax payments. (The Freijes' actual withholding credits for 1998 were $4,094.) A payment of $3,000 was sent with the 1998 return. Subsequent remittances of $1,000 and $1,587 were credited against their 1998 liability on April 19 and October 27, 1999, respectively.

---

[4](...continued)
reported as due on the 1997 return.

[5] While this reversing entry is dated July 8, 1998, on the Freijes' Form 4340, Certificate of Assessments, Payments, and Other Specified Matters, for 1997, we conclude that it did not occur on that date, as the refund triggered by the erroneous posting of this amount was issued almost 1 month later. We are persuaded that respondent did not become aware of the error until sometime after this refund was issued to the Freijes.

The Freijes timely filed a joint Federal income tax return for the 1999 taxable year (1999 return) reporting a tax due of $12,507.05, listing withholding credits of $4,318.96, and claiming estimated tax payments of $15,616.[6]  On or about May 29, 2000, respondent issued a notice to the Freijes, at the address they entered on the 1999 return, concerning the 1999 return and entitled "We Changed Your Estimated Tax Total--You Have An Amount Due".  The notice indicated that the 1999 return had been changed as follows:  (i) Taxable income had been increased from the $43,531 reported to $53,399, resulting in an increase in the tax shown as due on the return from $12,507.05 to $15,265; and (ii) estimated tax payments had been reduced from the $15,616 reported to $6,000.  On the same date as the notice, respondent assessed the increased tax of $15,265, without issuing a statutory notice of deficiency to the Freijes.

On December 27, 2000, respondent sent a letter to the Freijes with attached workpapers that explained in greater detail the foregoing changes made to the 1999 return.  With respect to the reduction in the claimed estimated tax payments, the letter advised that the Freijes' 1999 account showed 1999 estimated tax payments of only $6,000, consisting of two payments of $3,000 on

---

[6] According to the Forms 4340 in the record, the total remittances made by the Freijes during 1999, exclusive of the $3,000 payment submitted with the 1998 return, were $15,087. Insofar as the record discloses, these remittances were not designated by the Freijes for any taxable year.

November 10 and December 17, 1999.[7]  With respect to the increase

in taxable income, the letter advised that the $9,868 increase in

taxable income (from the reported $43,531 to $53,399) consisted

of the following items:

> (i) a $1,000 increase in income as a result of a
> discrepancy in that amount between the figure entered
> for adjusted gross income at the bottom of the first
> page of the 1999 return ($73,273) and the figure
> entered for adjusted gross income at the top of the
> second page ($72,273);
>
> (ii) a $320 increase in income resulting from the
> disallowance of a casualty or theft loss in that amount
> claimed on the 1999 return, on the grounds that the
> claimed loss did not consider the limitation of such
> losses to amounts in excess of 10 percent of adjusted
> gross income;
>
> (iii) a $20 increase in income resulting from the
> disallowance of a miscellaneous deduction for "P.O.
> Box" claimed on the 1999 return, explained in the
> letter as follows:  "Misc Deductions: A post office box
> is not a deductible expense";
>
> (iv) a $8,528 increase in income resulting from the
> disallowance of a miscellaneous deduction for "Lawyers"
> claimed on the 1999 return, explained in the letter as
> follows: "Other Misc Deductions: Lawyers are not a
> deductible expense.  They are deductible if the fees
> are paid to produce or collect taxable income or are in
> connection with the determination, collection, or
> refund of a tax."

On February 7, 2001, respondent issued to the Freijes a

Final Notice of Intent to Levy and Notice of Your Right to a

Hearing for income tax, interest, and penalties for taxable years

-----

[7] As noted, the Forms 4340 in the record state that the
Freijes made remittances during 1999 that totaled $15,087;
however, respondent applied $6,500 and $2,587 against the
Freijes' 1997 and 1998 liabilities, respectively.

1997, 1998, and 1999.  On February 18, 2001, respondent received a Form 12153, Request for a Collection Due Process Hearing, from petitioner (but not Mrs. Freije) regarding respondent's proposed collection action for the foregoing years.  As grounds for disagreeing with the proposed collection action, petitioner wrote as follows, "I am scheduled for audit in Greenwood IN.  You people have falsely accused me of writing a bad check for $10,000.00.  You deny receiving over $13,000.00 in estimated taxes.  * * *  I have amended 1997, 1998, 1999.  You owe me over $24,000.00."

On February 27, 2001, the Freijes filed an amended Federal income tax return for 1997, claiming an increase in itemized deductions of $14,940[8] and a resulting refund of $6,395.  On March 27, 2001, the Freijes filed amended Federal income tax returns for 1998 and 1999, claiming a $14,940[9] reduction in previously reported adjusted gross income for each of those years and resulting refunds of $8,996.50 and $8,752.73, respectively.[10]

---

[8] This figure equaled the portion of an increase in the Freijes' income for 1999 that had been proposed in an examination of the 1999 return, with which petitioner disagreed.

[9] These figures were likewise designed to offset the same proposed examination increase in the Freijes' income for 1999 with which petitioner disagreed.  See supra note 8.

[10] The 1998 and 1999 amended returns both claimed amounts for estimated tax payments that were different from the amounts claimed in the original returns for those years.

On or about April 30, 2001, an Appeals officer of respondent sent petitioner a letter advising him that a conference would be scheduled in the future. In May 2001, petitioner advised the Appeals officer that he did not wish to appear in person in respondent's office to attend a face-to-face meeting in connection with a hearing.

On June 4, 2001, petitioner and the Appeals officer discussed petitioner's request by telephone. During that conversation, petitioner advised the Appeals officer that he would be willing to "pay 25 cents per year for 1997, 1998, and 1999, call it even, and then start afresh with the year 2001." The Appeals officer advised petitioner that this proposed collection alternative to the levy was not acceptable. Later that day, petitioner left voice-mail messages for the Appeals officer seeking information concerning changes respondent made to his 1995, 1996, 1997, and 1998 returns that resulted in additional tax, additions to tax, and interest for those years as well as information concerning why payments intended for one year had been applied to other years. Petitioner further advised the Appeals officer that his problems began with his 1995 taxes. In addition, petitioner advised the Appeals officer of petitioner's claim that respondent had altered petitioner's check for $1,776 (intended as payment of his 1997 taxes) so that it was posted for

$11,776, which, according to petitioner, resulted in his being falsely accused by respondent of writing a bad check for $10,000.

On November 26, 2001, a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 was sent to petitioner. In the notice, the Appeals officer determined that all applicable laws and administrative procedures had been satisfied. With respect to petitioner's expressed concerns about his 1995 taxes, the Appeals officer explained that a remittance submitted by petitioner in 1997 and intended by him to be applied to that year's taxes was instead applied to 1995 taxes because the return and payment for 1995 had been received late, triggering an assessment of additions to tax and interest for that year to which the 1997 payment had been applied. With respect to 1997, the Appeals officer determined that, because respondent's incorrect posting of petitioner's $1,776 check as $11,776 had resulted in an erroneous refund with respect to 1997, the assessed failure to pay addition to tax would be abated. As for the remaining liabilities that were the subject of the levy, the Appeals officer determined: "The tax owed is from the original return for 1997, 1998 and 1999. Therefore, I recommend the government sustain the tax liability for * * * [those tax periods]." Concluding that the proposed levy represented an appropriate balancing of the need for efficient collection with the concern that the collection action be no more intrusive than

necessary, the Appeals officer determined that the proposed levy could proceed.

On January 14, 2002, petitioner filed a timely petition with this Court for review of the determination. The petition assigns a litany of errors to the determination, including (i) that respondent changed petitioner's 1995 through 1999 returns without notifying him; (ii) that respondent altered a check petitioner submitted in connection with the erroneous posting of his $1,776 payment as $11,776 for 1997; and (iii) that respondent denied receipt of certain payments petitioner made. Petitioner seeks as a remedy a refund of all Federal income taxes he paid for taxable years 1995 through 2001.

After the petition was filed, on March 11, 2002, respondent issued a notice of deficiency to the Freijes with respect to their 1999 taxable year. In the notice of deficiency, respondent determined, inter alia, that the Freijes were not entitled to the $320 casualty loss claimed in the 1999 return but were entitled to miscellaneous deductions of $8,935 (subject to the 2-percent limitation of section 67(a)). On the same day that the notice of deficiency was issued, respondent issued a claim disallowance letter to the Freijes, denying their claims for refund in their amended returns filed for 1997, 1998, and 1999. No petition was filed in this Court with respect to the notice of deficiency for 1999.

At trial and in his posttrial brief, respondent conceded that collection of petitioner's outstanding liability for 1997, representing that portion of the erroneous refund for 1997 that had not been collected, was prohibited by section 6532(b).

OPINION

Section 6331(a) authorizes the Secretary to levy upon property and property rights of a taxpayer liable for taxes who fails to pay those taxes within 10 days after notice and demand for payment is made. Section 6331(d) provides that the levy authorized in section 6331(a) may be made with respect to any "unpaid tax" only if the Secretary has given written notice to the taxpayer 30 days before the levy. Section 6330(a) requires the Secretary to send a written notice to the taxpayer of the "amount of the unpaid tax" and of the taxpayer's right to a section 6330 hearing at least 30 days before any levy is begun. This notice need only be given once for "the taxable period to which the unpaid tax specified in * * * [the levy notice] relates." Sec. 6330(a)(1).

If a section 6330 hearing is requested, the hearing is to be conducted by Appeals, and, at the hearing, the Appeals officer conducting it must verify that the requirements of any applicable law or administrative procedure have been met. Sec. 6330(b)(1), (c)(2). The taxpayer is entitled to one hearing with respect to "the taxable period to which the unpaid tax specified in * * *

[the levy notice] relates."  Sec. 6330(b)(2).  The taxpayer may raise at the hearing "any relevant issue relating to the unpaid tax or the proposed levy".  Sec. 6330(c)(2)(A).  The taxpayer may also raise challenges to the existence or amount of the underlying tax liability at a hearing if the taxpayer did not receive a statutory notice of deficiency with respect to the underlying tax liability or did not otherwise have an opportunity to dispute that liability.  Sec. 6330(c)(2)(B).  The underlying tax liability that may be challenged includes amounts reported as due on a return.  Montgomery v. Commissioner, 122 T.C. 1 (2004).

At the conclusion of the hearing, the Appeals officer must determine whether and how to proceed with collection and shall take into account (i) the verification that the requirements of any applicable law or administrative procedure have been met, (ii) the relevant issues raised by the taxpayer, (iii) challenges to the underlying tax liability by the taxpayer, where permitted, and (iv) whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the taxpayer that the collection action be no more intrusive than necessary.  Sec. 6330(c)(3).

We have jurisdiction to review the Appeals officer's determination where we have jurisdiction over the type of tax involved in the case.  Sec. 6330(d)(1)(A); see Iannone v. Commissioner, 122 T.C. 287, 290 (2004).  Generally, we may

consider only those issues that the taxpayer raised during the section 6330 hearing. See sec. 301.6330-1(f)(2), Q&A-F5, Proced. & Admin. Regs.; see also Magana v. Commissioner, 118 T.C. 488, 493 (2002). Where the underlying tax liability is properly at issue, we review the determination de novo. E.g., Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). Where the underlying tax liability is not at issue, we review the determination for abuse of discretion. Id. at 182. Whether an abuse of discretion has occurred depends upon whether the exercise of discretion is without sound basis in fact or law. See Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 371 (1995).

Petitioner, proceeding pro se, seeks a refund of all income taxes paid for taxable years 1995 through 2001. Our jurisdiction in this case is confined, however, to a review of the Appeals officer's determination approving a levy to collect unpaid tax liabilities for 1997, 1998, and 1999. We shall treat petitioner as contesting the Appeals officer's determination for all years, and consider his arguments to the extent they have any bearing thereon. In particular, we find that petitioner's communications with the Appeals officer may be fairly construed as proposing a collection alternative, and as raising the issue that payments he made with respect to the years in issue were not properly accounted for by respondent and that the tax reported as due on

his returns for some or all of the years in issue was changed inappropriately by respondent.[11]

Proposed Collection Alternative

We can readily dispose of petitioner's proposed collection alternative. His offer of 25 cents per year for 1997, 1998, and 1999 is frivolous, and the Appeals officer's rejection of it was not an abuse of discretion.

1997

Although respondent now concedes he may not collect the unpaid balance of petitioner's 1997 liability by levy, we nonetheless find it necessary to consider that year because, first, petitioner claims that payments that were intended to satisfy his 1997 liability were instead applied to 1995. If these payments were improperly applied to 1995, then respondent's computation (and assessment) of the additions to tax for late payment and failure to pay estimated tax for 1997 would be

---

[11] We shall also assume, without deciding, that by mentioning his amended returns for 1998 and 1999 in his request for a hearing, petitioner thereby raised challenges at the hearing to the underlying tax liabilities as originally reported in the 1998 and 1999 returns. Regardless of whether these issues are treated as having been raised, there is no effect on the outcome because the challenges, as discussed infra, have no merit.

While petitioner also mentioned his amended return for 1997 in his hearing request, we conclude that any issue thereby raised is moot as a result of respondent's concession that the levy for 1997 should not proceed.

incorrect.[12]  Second, respondent applied $6,500 of remittances made by the Freijes in 1999 to their 1997 liability, even though all assessments of the 1997 liability were extinguished by respondent's crediting of petitioner's $1,776 check as $11,776 on July 8, 1998.  Although neither party has addressed the issue, as discussed more fully below, respondent's application of the Freijes' 1999 remittances to their 1997 account contravenes O'Bryant v. United States, 49 F.3d 340 (7th Cir. 1995).

Claim of Payment

With respect to petitioner's contention that certain 1997 payments were improperly applied to 1995, respondent argues that we lack jurisdiction to consider 1995, citing Lister v. Commissioner, T.C. Memo. 2003-17.  We disagree.  We held in Lister, a Memorandum Opinion, that our jurisdiction under section 6330(d)(1) was confined to the years that were the subject of the notice of determination, where the taxpayer had attempted in the

---

[12] Had the Freijes' June 3, 1997, remittance of $2,800 (which was undesignated insofar as the record discloses) not been applied in part against their 1995 liability, we assume respondent would have treated it as a payment of estimated tax for 1997, as he did with respect to the Freijes' $2,300 remittance made 1 week later on June 10, 1997, and their $1,500 remittance made on Oct. 6, 1997.  There is evidence that the Freijes intended all of the foregoing remittances to be payments of estimated tax for 1997, in that they reported in the 1997 return the total of these three remittances ($6,600) as the amount of estimated tax paid.

On this record, given the Freijes' myriad remittances, we are unable to conclude that a change in the unpaid liability for 1997 would have had no impact on the computation of any additions to tax for untimely payment in 1998 and 1999.

petition to put in issue all years subsequent to the 2 years covered by the notice. Here, petitioner's claim is that a payment intended for 1997, a year that was a subject of the notice of determination (determination year), was instead applied to a liability for 1995, a year that was not a subject of the notice of determination (nondetermination year).

We do not read Lister as precluding our consideration of facts and issues arising in nondetermination years where those facts and issues are relevant to a taxpayer's claim that the tax which is the subject of a collection action has been paid. As discussed below, we believe our jurisdiction extends in appropriate circumstances to years other than those in which the tax liability sought to be collected arises.

Our jurisdiction under section 6330 covers the "determination" of the Appeals officer who conducted the hearing requested under that section. See sec. 6330(d)(1)(A) ("the Tax Court shall have jurisdiction with respect to [the determination of an Appeals officer under section 6330]"). Section 6330(c)(3) prescribes the matters that the Appeals officer's determination "shall" take into consideration, which include "the issues raised under paragraph (2) [of section 6330(c)]". Paragraph (2) of section 6330(c) entitles the person upon whose property the Commissioner seeks to levy (the taxpayer) to raise at the hearing "any relevant issue relating to the unpaid tax or the proposed

levy", par. (2)(A), and, if he did not receive any statutory notice of deficiency for, or otherwise have an opportunity to dispute, the underlying tax liability, he may also raise "challenges to the existence or amount of the underlying tax liability for any tax period", par. (2)(B).

Thus, our jurisdiction is defined by the scope of the determination, which must take into consideration, if raised by the taxpayer, "any relevant issue relating to the unpaid tax or the proposed levy" and, in certain circumstances, "challenges to the existence or amount of the underlying tax liability for any tax period".

There is no question that petitioner raised the issue of a remittance made in 1997 having been applied (improperly, in petitioner's view) to satisfy a 1995 liability, as the determination discusses his claim and traces the application of the remittance.[13] The question is whether the propriety of applying the 1997 remittance to satisfy the 1995 liability is a "relevant issue relating to the unpaid tax or the proposed levy". If so, we have jurisdiction, as the statute required the determination to take into consideration the issue and our jurisdiction encompasses the determination. For the reasons discussed below, we conclude our jurisdiction is not confined to

_____

[13] There is also no dispute that the Freijes made the claimed remittance of $2,800 on or about June 3, 1997, as the Form 4340 for 1995 records a payment in that amount on that date.

the year (or period) to which the unpaid tax relates, as respondent contends, but extends to facts and issues in nondetermination years where they are relevant to computing the unpaid tax.

In interpreting the scope of section 6330(c)(2), we note first that the legislative history indicates that Congress intended a broad construction of the issues that a taxpayer was entitled to raise under that section. "In general, any issue that is relevant to the appropriateness of the proposed collection against the taxpayer can be raised at the pre-levy hearing." H. Conf. Rept. 105-599, at 265 (1998), 1998-3 C.B. 747, 1019.

Second, considering the terms of the statute in their ordinary meaning, a "relevant issue relating to the unpaid tax or the proposed levy" surely includes a claim, such as the one here, that the "unpaid tax" has in fact been satisfied by a remittance that the Commissioner improperly applied elsewhere. Both section 6331, which empowers the Commissioner to impose a levy, and section 6330, which requires the Commissioner to afford a hearing before proceeding with a levy and provides our jurisdiction to review his determination to proceed with a levy, contemplate an "_unpaid_ tax". Secs. 6330(a)(1), (3)(A), (b)(2) and (3), (c)(2)(A), 6331(d)(1) (emphasis added). Since an "unpaid tax" is the sine qua non of the Commissioner's authority to levy, we

believe a claim directed at the status of the tax as "unpaid" is a "relevant issue relating to the unpaid tax or the proposed levy". Sec. 6330(c)(2)(A). Meaningful review of a claim that a tax sought to be collected by levy has been paid, by means of a remittance or an available credit, will typically require consideration of facts and issues in nondetermination years, as those years may constitute the years to which a remittance was applied or from which a credit originated.[14]

Finally, we note that, notwithstanding respondent's present position, the Appeals officer interpreted the statute to require her consideration of petitioner's claim that certain remittances intended for 1997 had been applied improperly to 1995. The determination specifically addresses this claim, and traces the application of the Freijes' June 3, 1997, remittance to an

---

[14] Indeed, we have routinely considered facts and issues in nondetermination years in these circumstances. See, e.g., Landry v. Commissioner, 116 T.C. 60 (2001) (untimely claim for application of overpayments from nondetermination years); Leineweber v. Commissioner, T.C. Memo. 2004-17 (claim that overpayment in determination year was applied to nondetermination year for which period of limitation on collection had expired); Tedokon v. Commissioner, T.C. Memo. 2002-308 (same as Landry); Lee v. Commissioner, T.C. Memo. 2002-233 (same as Landry), affd. 70 Fed. Appx. 471 (9th Cir. 2003); Kazunas v. Commissioner, T.C. Memo. 2002-188 (existence of overpayment in nondetermination year); Sponberg v. Commissioner, T.C. Memo. 2002-177 (claim that Commissioner had not accounted for all payments in nondetermination years, which if accounted for would result in overpayments available for application to determination years). Apparently no issue was raised in the foregoing cases concerning our jurisdiction to consider facts and issues arising in nondetermination years.

outstanding liability for 1995 representing an assessment for failure to file and failure to pay additions to tax as well as interest.

For the foregoing reasons, we hold that our jurisdiction under section 6330(d)(1)(A) encompasses consideration of facts and issues in nondetermination years where the facts and issues are relevant in evaluating a claim that an unpaid tax has been paid.

In reaching this conclusion, we are mindful that in the case of our deficiency jurisdiction, section 6214(b) imposes limitations on our jurisdiction with respect to years other than the year for which a deficiency has been determined. Section 6214(b) provides that, in redetermining a deficiency of income tax for any taxable year, this Court "shall consider such facts with relation to the taxes for other years * * * as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other year * * * has been overpaid or underpaid." In interpreting this provision--

> We have distinguished our authority under section
> 6214(b) to compute a tax for a year not before the
> Court from our lack of authority under that same
> section to "determine" a tax for such year. In Lone
> Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440
> (1974), affd. without published opinion 510 F.2d 970
> (3d Cir. 1975), we stated that section 6214(b) "does
> not prevent us from computing, as distinguished from
> 'determining', the correct tax liability for a year not
> in issue when such a computation is necessary to a

> determination of the correct tax liability for a year
> that has been placed in issue." [<u>Hill v. Commissioner</u>,
> 95 T.C. 437, 439-440 (1990).]

Thus, section 6214(b) does not foreclose our authority (i) to consider facts and issues in a nondeficiency year and on the basis thereof compute the tax liability for that year (regardless of the tax liability reported by the taxpayer or assessed by the Commissioner), or (ii) to employ the recomputed tax liability in redetermining the tax liability for the year for which a deficiency was determined. The limiting conditions of section 6214(b) are that the computation of the other year's tax liability be necessary to the redetermination of the tax liability at issue and that our recomputation not constitute a determination of the other year's liability for any other purpose.

There is no statutory provision comparable to section 6214(b) that limits the jurisdiction granted by section 6330(d)(1)(A). Nonetheless, our holding conforms to the principles of section 6214(b). We conclude that our jurisdiction under section 6330(d)(1)(A) extends to the consideration of facts and issues in a nondetermination year only insofar as the tax liability for that year may affect the appropriateness of the collection action for the determination year. In exercising that jurisdiction, we do not determine whether any collection action

with respect to the nondetermination year may proceed, but only whether collection action may proceed in the determination year.

Having decided our jurisdiction to consider facts and issues in 1995, we turn to consideration of petitioner's claim that his 1997 liability had been paid. In an effort to demonstrate that respondent had not properly credited him with payments he made to satisfy his 1997 liabilities, petitioner testified that he had timely filed his 1995 return. If the 1995 return had been timely filed, then the $3,005.47 payment submitted with that return, when added to withholding credits, would have fully satisfied the tax reported as due on the 1995 return, and no additions to tax for late filing or late payment would have been owed. As a consequence, it would not have been proper for respondent to apply (as he did) a portion of the $2,800 payment received from the Freijes on June 3, 1997, against any 1995 liability, as there would have been none.

However, we have found that the 1995 return was untimely filed on November 18, 1996. We based that finding on an evaluation of the parties' respective evidence. Respondent offered from his records a certified copy of a completed Form 1040, U.S. Individual Income Tax Return, for 1995 bearing the Freijes' signatures, with a "received" stamp of November 18, 1996, and with a date of "11-16-96" entered next to the signatures. The Form 4340 for 1995 likewise indicates a filing

date for the return of November 18, 1996.  Petitioner offered a Form 1040 with a date of "1-16-96" entered next to the signatures.  In addition, petitioner offered a copy of his check to the IRS, bearing a date of "1-16-96".  This copy had no bank markings indicating it had been negotiated, which petitioner explained was due to the fact that it was a copy of the check made before mailing it to the IRS.  Petitioner also produced a copy of the negotiated version of the same check, yet this copy bore a date of "11-16-96", consistent with a November 1996 filing.[15]  Moreover, petitioner produced a copy of a request for an automatic 4-month extension of time for filing the 1995

---

[15] As to the discrepancy in the "1-16-96" and "11-16-96" dates on the two copies of the same check he wrote as payment of his 1995 taxes, petitioner testified that the check bore the "1-16-96" date when he mailed it to respondent, which implies that someone at the IRS altered the check by adding the numeral "1" to the month indicator in the date.

This claim arouses greater suspicion when considered in light of the fact that petitioner is also claiming that someone at the IRS altered the numeral "1" on another of his checks; namely, the check for $1,776 intended as payment towards his 1997 taxes that was erroneously posted by respondent as a payment of $11,776.  That check is also in evidence and contains inconsistent entries designating its amount; namely, a numeric entry of "$1,1776.00" [sic] and a written entry of "One thousand seven hundred seventy six" dollars.

The recurrent manipulation of the numeral "1" on petitioner's checks undermines the credibility of both his claims that IRS personnel altered his checks.  We need not resolve the dispute concerning the $1,776 check, however, given respondent's concession that his effort to recover the erroneous 1997 refund resulting from the incorrect posting of this check is barred by sec. 6532(b).  Nonetheless, one is left with the singular sensation that petitioner's recurrent problems with the numeral "1" are too similar to be explained by malfeasance on the part of IRS employees.

return, with the signatures thereon dated February 10, 1996. The Form 4340 for 1995 indicates that a 4-month extension was granted. Yet petitioner offers no convincing explanation why, if he filed a return for 1995 in January 1996 as he claims, he sought a filing extension in February 1996. Given the significant contradictory evidence, petitioner's self-serving claim that he filed a return for 1995 in January 1996[16] is not credible.

Because petitioner's 1995 return and accompanying payment were untimely, respondent assessed additions to tax for late filing and late payment for that year. As a consequence, respondent was entitled to apply the June 2, 1997, payment submitted by the Freijes, which it has not been shown was designated for any year, in satisfaction of his 1995 liability. See Rev. Rul. 73-305, 1973-2 C.B. 43. Therefore, respondent's assessment of the additions to tax for late payment and failure to pay estimated tax for 1997 was correct.

Respondent's Application of 1999 Remittances to 1997 Liabilities

On or about July 6, 1998, petitioner mailed a check for $1,776 to respondent. This check was erroneously posted to the

---

[16] Petitioner also claims that he filed a return for 1995 in July 1996 and offered into evidence a purported copy of that return, which respondent has no record of receiving. In light of the greater weight of the evidence, discussed above, that he filed the 1995 return in November 1996, we are likewise unpersuaded that petitioner filed in July 1996.

Freijes' 1997 account in the amount of $11,776 on July 8, 1998.
As this amount exceeded all unpaid assessments for 1997,
respondent issued the Freijes a refund of $5,513 for that year on
August 3, 1998. Sometime after August 3, 1998, respondent became
aware of the $10,000 error and made reversing entries on the
Freijes' 1997 account.[17] However, no assessments were recorded
subsequent to the August 3, 1998, refund. Respondent thereafter
applied four remittances made by the Freijes in 1999, totaling
$6,500, to their 1997 account.

Respondent's application of these 1999 remittances to the
Freijes' 1997 account in an effort to recover the erroneous
refund contravenes O'Bryant v. United States, 49 F.3d 340 (7th
Cir. 1995). In O'Bryant, the Court of Appeals for the Seventh
Circuit, to which an appeal in this case would ordinarily lie,
held that the Commissioner may not use his postassessment
collection powers to recover an erroneous nonrebate refund. In
that case, the taxpayer made a payment that satisfied an
outstanding assessment. The Commissioner mistakenly credited the
payment to the taxpayer's account twice and consequently issued
the taxpayer a refund in the amount of the payment plus interest.
Upon discovering his mistake, the Commissioner recovered a
portion of the refund by levy and by applying overpayments and

---

[17] The reversing entries were dated as of the original
erroneous posting (July 8, 1998). See supra note 5.

remittances from other years to the taxpayer's account for the year of the refund, without having made another assessment. The Court of Appeals concluded that, since the assessment had been extinguished by the taxpayer's payment, the Commissioner could not employ his summary collection powers in the absence of an assessment, but instead had to recover the erroneous refund through an erroneous refund action under section 7405.[18]

Respondent has applied $6,500 in 1999 remittances to the Freijes' 1997 account in an effort to recover the erroneously refunded $5,513 (plus interest, presumably). Under O'Bryant, he may not do so. Instead, these 1999 undesignated remittances, under respondent's then-applicable procedures, see Rev. Rul. 73-305, supra, should have been applied to satisfy outstanding assessments for 1998. Had the 1998 assessments been thereby satisfied, presumably some portion of these 1999 remittances would have been available for application to the Freijes' 1999 account. Consequently, we conclude that the levies for 1998 and 1999 should not be sustained in their present form, as the unpaid tax for each year may be affected by the proper application of the $6,500 in 1999 remittances by the Freijes.

---

[18] The Court of Appeals declined to decide whether, as the Commissioner contended, he had a further option of recovering the refund through a suit begun within the limitations period of sec. 6501, without regard to sec. 7405.

1998

Respondent has conceded that the Appeals officer's determination to proceed with the levy with respect to petitioner's 1998 liability failed to take into account $4,094 of withholding credits of Mrs. Freije that were not listed on the 1998 return.

The only specific dispute of his 1998 liability that we can identify as having been raised by petitioner arises by virtue of the Freijes' amended return for 1998.[19] In the amended return, the Freijes claimed a reduction in 1998 adjusted gross income of $14,940, which was calculated as reducing the tax due from the $11,686 originally reported to $7,097.50.[20] While petitioner may dispute in this proceeding the amount reported as due on the 1998 return, see Montgomery v. Commissioner, 122 T.C. 1 (2004), there is no merit to the grounds on which petitioner now disputes the amount reported as due on the 1998 return. Petitioner testified that he claimed a $14,940 reduction in adjusted gross income on the amended return for 1998 because this was an amount by which an agent of respondent, upon examination of the 1999 return,

---

[19] See supra note 11.

[20] Because the Freijes claimed, for the first time in the amended return for 1998, that they were entitled to 1998 credits for withholding and estimated taxes of $4,094 and $12,000, respectively, the refund claimed in the 1998 amended return was $8,996.50, an amount exceeding the difference between the tax reported as due on the original versus the amended return.

proposed to increase the Freijes' adjusted gross income for 1999. Without more, we see no merit in petitioner's challenge to the underlying liability for 1998.

The Appeals officer's determination to proceed with the levy has not taken into account, however, the $4,094 in withholding credits of Mrs. Freije to which respondent concedes the Freijes are entitled, or the $6,500 in 1999 remittances that were improperly applied to the Freijes' 1997 account. Given these infirmities, the determination that the levy for 1998 could proceed without modification was an abuse of discretion.

1999

The unpaid tax for 1999 that is sought to be collected by the levy at issue includes an assessment of tax of $15,265 (as well as an estimated tax addition to tax and interest) that respondent made on May 29, 2000. For the reasons outlined below, we conclude that a portion of this assessment is invalid.

The Freijes reported a tax due of $12,507 on the 1999 return, timely filed on April 15, 2000. However, on May 29, 2000, pursuant to what respondent concedes was a so-called math error notice under section 6213(b)(1), respondent adjusted various items reported on the 1999 return, resulting in an increase in the reported tax to $15,265, which was assessed on the same date.

Section 6213(b)(1) in general allows the assessment of tax in excess of that shown on a return (i.e., without resort to the deficiency procedures of sections 6211-6216) in cases where the additional amount of tax is attributable to "a mathematical or clerical error appearing on the return".  Section 6213(g)(2) defines "mathematical or clerical error" for this purpose generally as an error in addition, subtraction, multiplication, or division shown on a return; an incorrect use of an IRS table if apparent from the existence of other information on a return; an item entry on a return which is inconsistent with another entry of the same or another item on the return; an omission of information which is required to be supplied on a return to substantiate an entry; an entry on a return of a deduction in an amount which exceeds a statutory limit if the items entering into the computation of the limit appear on the return; and various other instances not pertinent here.  See sec. 6213(g)(2)(A)-(M).

As noted in our findings of fact, respondent's "math error" adjustments to the 1999 return included a correction of inconsistent entries for adjusted gross income and of a casualty loss claimed without regard to the limitation of such losses to amounts exceeding 10 percent of adjusted gross income.  We have no quarrel with these adjustments, as they fall squarely within

the provisions of section 6213(b)(1).[21]  See sec. 6213(g)(2)(C),
(E).  However, respondent also purported to disallow, pursuant to
section 6213(b)(1), an "other miscellaneous" deduction (i.e., a
miscellaneous deduction not subject to the 2-percent limitation
of section 67(a)) of $8,528 claimed on Schedule A, Itemized
Deductions, of the return for "Lawyers" and a "miscellaneous"
deduction (i.e., one subject to the 2-percent limitation) of $20
claimed on the Schedule A for a "P.O. Box".

In the instant proceeding, respondent does not attempt to
defend the foregoing disallowances as a permissible application
of section 6213(b)(1).[22]  Instead, respondent takes the position
that, because the miscellaneous deductions were disallowed
pursuant to a "math error" notice under section 6213(b)(1)
without the issuance of a notice of deficiency, petitioner did
not have any previous "opportunity to dispute" the underlying tax
liability within the meaning of section 6330(c)(2)(B).  Thus,
respondent reasons, petitioner is entitled to dispute the
underlying tax liability associated with the disallowed

---

[21] The "math error" notice also indicated that the Freijes'
estimated tax payments for 1999 totaled $6,000 rather than the
$15,616 claimed on the 1999 return.  As previously noted,
additional remittances totaling $6,500 and $2,587, made by the
Freijes in 1999 but undesignated, were applied to their 1997 and
1998 liabilities, respectively.

[22] The record does not disclose whether petitioner sought an
abatement (under sec. 6213(b)(2)) of the assessment made by
respondent pursuant to sec. 6213(b)(1).

deductions in the present section 6330 proceeding, and we are urged to undertake de novo review under section 6330 of petitioner's entitlement to those deductions. In respondent's view, such de novo review should result in petitioner's 1999 liability's being adjusted to reflect an allowance of $7,701.25 of the claimed miscellaneous deduction for legal fees (the amount that respondent concedes petitioner has substantiated in this proceeding), reduced pursuant to section 67(a) by an amount equal to 2 percent of adjusted gross income.

Petitioner contends that he has substantiated the full $8,528 deduction claimed on the 1999 return and that, in connection with the examination of his 1999 return, respondent's agent allowed his claimed deduction for legal fees. The notice of deficiency for 1999, issued after the notice of intent to levy for that year, provides some corroboration for petitioner's claim, in that it allowed $8,935 in miscellaneous deductions (subject to the 2-percent limitation) without further specifying the basis for the allowance.[23] As to any possible discrepancy in respondent's treatment of the legal fees deduction in the instant proceeding and his treatment in the notice of deficiency (and any consequent inconsistency in the assessment that respondent became entitled to make when the Freijes defaulted with respect to the

---

[23] As noted, no petition was filed in response to the notice of deficiency for 1999.

notice of deficiency[24]), respondent takes the position on brief that we should undertake a de novo determination of petitioner's entitlement to the claimed deduction for legal fees pursuant to section 6330(c)(2)(B) and that any such determination will generally be binding on the parties in any subsequent litigation under the doctrine of collateral estoppel. Accordingly, respondent represents, respondent will "make any necessary adjustments" to the liability to conform to our decision.

We reject respondent's contention that we should undertake de novo review of petitioner's entitlement to the miscellaneous deductions claimed. The assessment of the 1999 liability made pursuant to the math error notice, which the levy at issue in this proceeding seeks to collect, is simply invalid insofar as it results from the disallowance of petitioner's miscellaneous deductions claimed on the 1999 return. That portion of the assessment violated section 6213(a), which generally prohibits the assessment of a deficiency without affording the taxpayer the opportunity to petition for redetermination of the deficiency in

---

[24] The record does not disclose whether an assessment was made after the Freijes failed to file a petition with respect to the notice of deficiency for 1999. The Form 4340 covering 1999 that is in the record was generated before the issuance of the notice of deficiency. However, respondent's counsel represents on brief that petitioner has a liability for 1999 that is based on the notice of deficiency, as distinguished from the liability based on the math error notice.

this Court.[25]   Cf. <u>Israel v. Commissioner</u>, T.C. Memo. 2003-198,
affd. 88 Fed. Appx. 941 (7th Cir. 2004).   In our view,
respondent's failure to show that the disallowance of the
miscellaneous deductions fell within the "math error" exception,
or some other exception, to the proscription of section 6213(a)
on assessments without deficiency procedures is fatal to that
portion of the math error assessment that is based on the
disallowance of the miscellaneous deductions.

Respondent in effect seeks to cure the defect in the math
error assessment by conceding petitioner the opportunity to
dispute the disallowance in this proceeding.   While it is true
that section 6330(c)(2)(B) provides that a taxpayer whose
property is the subject of a proposed levy may dispute the
"underlying tax liability" if he "did not receive any statutory
notice of deficiency for such tax liability or did not otherwise
have an opportunity to dispute such tax liability", that
provision should not be construed to allow respondent to employ

---

[25] Sec. 6213(a) provides in part:

> Except as otherwise provided in * * * [the case of
> certain termination or jeopardy assessments] no
> assessment of a deficiency in respect of any tax
> imposed by subtitle A * * * and no levy or proceeding
> in court for its collection shall be made, begun, or
> prosecuted until * * * [a] notice [of deficiency] has
> been mailed to the taxpayer, nor until the expiration
> of such 90-day or 150-day period [in which the taxpayer
> may petition the Tax Court for redetermination of the
> deficiency] * * *.

it to perfect an assessment made in derogation of section 6213(a). We have previously construed the phrase "did not receive any statutory notice of deficiency" as used in section 6330(c)(2)(B) as encompassing the situation where a notice of deficiency, though mailed by the Commissioner, was not in fact received by the taxpayer. See Calderone v. Commissioner, T.C. Memo. 2004-240; Tatum v. Commissioner, T.C. Memo. 2003-115. Respondent would have us extend the meaning of that phrase to encompass the situation where a taxpayer did not receive any notice of deficiency because the Commissioner failed to issue one, in violation of section 6213(a).

We decline to do so. Such an interpretation would contravene the intent underlying section 6330, a measure intended to expand taxpayers' rights in collection actions. See S. Rept. 105-174, at 67 (1998), 1998-3 C.B. 537, 603. Under the interpretation of section 6330(c)(2)(B) urged by respondent, de novo review in a section 6330 proceeding could substitute for the taxpayer's right to a deficiency proceeding under sections 6211-6216. A taxpayer's rights in the former proceeding are more circumscribed than in the latter.[26] Moreover, such a construction

---

[26] For example, a taxpayer must petition this Court for review within 30 days of a determination under sec. 6330, see sec. 6330(d)(1), whereas he has 90 days or, if outside the United States, 150 days to petition with respect to a notice of deficiency, see sec. 6213(a). See also Sarrell v. Commissioner, 117 T.C. 122 (2001) (no expanded filing period under sec. 6330

(continued...)

would conflict with other provisions of section 6330.  Section 6330(c)(1) and (3) requires, in connection with the hearing provided under section 6330, that the Appeals officer obtain verification "that the requirements of any applicable law or administrative procedure have been met" and that he take such verification into account in determining whether the levy should proceed.  One requirement of applicable law is the mandate of section 6213 that, except in certain cases, including those involving termination or jeopardy assessments, an opportunity for preassessment judicial review precede the assessment or collection of any deficiency, generally defined to encompass income tax in excess of the amount reported on a return.  Thus, the requirement of section 6330(c)(1) that the Appeals officer verify compliance with applicable law cannot be reconciled with an interpretation of section 6330(c)(2)(B) that allows the Commissioner to avoid compliance with section 6213(a).

We accordingly hold that petitioner's opportunity in a section 6330 proceeding to dispute the underlying tax liability does not cure an assessment made in derogation of his right under section 6213(a) to a deficiency proceeding.

As a consequence, the determination to proceed with collection of that portion of the math error assessment based on

---

[26](...continued)
 for notices of determination addressed to persons outside the United States).

the disallowance of the Freijes' miscellaneous deductions was error as a matter of law and accordingly an abuse of discretion. The Appeals officer's verification that the requirements of applicable law had been met was incorrect. The statement in the notice of determination that the tax owed for 1999 "is from the original return" is wrong; it overlooks the adjustments to the return improperly claimed as math errors under section 6213(b)(1). Accordingly, the levy to collect the foregoing portion of the 1999 assessment may not proceed.

Conclusion

Respondent has conceded that the determination to proceed with the levy for 1997 should not be sustained, and that the determination to proceed with the levy for 1998 failed to take into account $4,094 in withholding credits. With respect to the levies for 1998 and 1999, we have found that $6,500 in remittances made by the Freijes in 1999 were unlawfully applied to their 1997 account and should have been available to satisfy liabilities for 1998 and/or 1999.[27] Thus, the unpaid tax for those years, upon which the levies are based, may not be correct. Further, we have found that a portion of the 1999 assessment on which the levy for 1999 is based is invalid.

---

[27] If the $6,500 in 1999 remittances that was applied to the 1997 account is applied to the 1998 account, the result may be that the $2,587 in 1999 remittances that was applied to 1998 may be available to satisfy 1999 liabilities.

Given the various infirmities in the proposed levies for 1998 and 1999, which demonstrate that the determination to proceed with the 1998 and 1999 levies in full was an abuse of discretion, we shall remand the determination for those years to the Office of Appeals for reconsideration.

To reflect the foregoing,

<u>An appropriate order</u>

<u>will be issued</u>.